# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **EDWARD E. PHILLIPS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | **5:14-CV-1274-VEH** |
| | ) | |
| **PPG INDUSTRIES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## <u>MEMORANDUM OPINION</u>[1]

This employment discrimination action was originally filed on July 1, 2014, by the plaintiff, Edward E. Phillips, against the defendant, PPG Industries, Inc. ("PPG"). (Doc. 1). In the five counts of his complaint, the plaintiff alleges that PPG, his former employer, subjected him to disparate treatment, on account of his disability, in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"). The case comes before the court on the defendant's motion for summary judgment. (Doc. 13). For the reasons stated herein, the motion will be **GRANTED**.

## I.     STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to

---

[1] The previous version of this opinion (doc. 26) was entered in error.  That opinion is **VACATED** and **STRICKEN** in favor of this opinion.

judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains

supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   FACTS

### A.   PPG's Huntsville Facility and Personnel Pertinent to This Action

PPG operates a manufacturing facility in Huntsville, Alabama. This facility is in PPG's Aerospace Division and manufactures windshields and windows for the commercial, regional, and military aviation sectors. Phillips was hired by PPG, on February 10, 1997. At all times material to the events described in the complaint, Phillips worked in the "Finishing Department Seniority Sub-Unit" of PPG (the "Finishing Department"). This action is in part based on the denial of the plaintiff's request to be transferred to the "Pre-Finish Inspector" position. That position is in the

"Inspection Department Seniority Sub-Unit" (the "Inspection Department") of PPG.

### 1.   *The Plaintiff, Edward E. Phillips*

Phillips lost his hearing in 1978 when he was 20 years old. He has complete hearing loss. Phillips's employment with PPG began February 10, 1997. During his employment, PPG communicated with the plaintiff in writing. The plaintiff received his work instructions in writing, and it is undisputed that he understood them.

Throughout his employment, the plaintiff received training on many different jobs, and he received pay raises. At all times material to the Complaint, Phillips worked as a "Finisher," on Second Shift, in the Finishing Department.

### 2.   *Chester Woodard*

Chester Woodard was the supervisor over the second-shift in the Finishing Department during the last year or two of the plaintiff's employment. Woodard was Phillips's direct supervisor. Phillips does not claim Woodard took any action against him because of his hearing loss.

### 3.   *Jamie Stephens*

During the plaintiff's employment, Jamie Stephens was the first shift supervisor over the "Airbus Military Area" in the Finishing Department. Stephens was never the plaintiff's direct supervisor. Stephens always worked on the first shift.

### 4.    *Tom Meyer*

Tom Meyer has been employed by PPG for almost 27 years, and has been the Huntsville Plant Manager since February 2013. Meyer handled Phillips's appeal of his discharge. Phillips does not accuse Mr. Meyer of taking any action against him because of Phillips's hearing loss.

### 5.    *Rose Smith*

Rose Smith is a Personnel Manager and has been employed by PPG since March 5, 2012. Phillips does not accuse Smith of taking any action against him because of Phillips's hearing loss. Phillips never told Smith that Phillips believed he was being treated differently by anyone due to his hearing loss.

### 6.    *Jose Vega*

Jose Vega was the Human Resources Manager at PPG from October 15, 2012, through January 31, 2015. Vega made the decision to discharge Phillips after Phillips's second failed drug screen. Phillips does not allege in this case that Vega took any action against Phillips because of Phillips's hearing loss.

### 7.    *Deborah Jackson*

Deborah Jackson is the occupational heath nurse at PPG.

## B.    **PPG's EEO Policy**

PPG is an equal opportunity employer and is committed to "equal consideration

to all applicants for employment regardless of . . . disability," and "[t]his same non-discriminatory consideration will apply to all employment actions such as promoting, disciplining or demoting employees." (Doc. 13-1 at 7). Phillips had access to PPG's Human Resources Department to address any perceived disability discrimination, and the Huntsville facility also utilizes an ethics hotline for employees to call if they believe they are being harassed. The hotline number is posted on posters which are hanging on the two bulletin boards at the facility.

### C.   PPG's Alcohol, Drug, and Other Intoxicants Policy

PPG has an alcohol, drug and other intoxicants ("ADI") policy. The policy states:

> The possession, use, distribution, sale, purchase or manufacture or illegal drugs by Company employees while on Company premises or while engaged in Company business is strictly prohibited. An employee who reports to work with illegal drugs in his or her system or who has a positive drug screen is in violation of this Policy, This also includes, but is not limited to, the operation of a Company owned or leased vehicle.

> Any employee who reports to work or engages in work with prohibited concentrations of alcohol in his or her blood is in violation of this Policy. This also includes, but is not limited to, the operation of a Company owned or leased vehicle. Management may prohibit the possession of all alcohol on Company premises at designated locations.

(Doc. 13-1 at 11). Under the ADI policy, employees are subjected to random drug testing. (Doc. 13-1 at 13). The policy provides that "[u]nder the random drug testing

7

process, an employee might not be tested at all or might be tested more than once during the year." (Doc. 13-1 at 13). All employees at the Huntsville facility are subject to random drug testing from the plant manager all the way down; no one is exempt.

The first time an employee fails a Company drug screen, they are required to enter into a "Rehabilitation Agreement" with PPG in order to remain employed. Pursuant to the Rehabilitation Agreement, the employee

> agrees to be placed in a FAA compliant follow-up testing regimen of at least six follow-up tests in the first twelve (12) calendar months following Employee's return to active work. Employee will be subject to additional periodic intoxicant follow-up testing after Employee's return to duty for up to and including sixty (60) months. Any refusal to consent or cooperate fully with screening, or any positive screening result will result in immediate discharge.

(Doc. 13-2 at 43). Phillips was familiar with PPG's ADI policy because he failed a PPG drug screen in 2000.  Phillips was asked in his deposition if "[a]t the time you entered into the [R]ehabilitation [A]greement, you understood that if you failed another drug screen with PPG, you would be discharged, correct?" (Doc. 13-2 at 10(38)). He answered, "Right. That's why I quit smoking pot." (Doc. 13-2 at 10(38)).

Employees are selected for drug screens by an entity that is external to the company. PPG uses a third party vendor, a company called "First Advantage," to randomly select employees for drug testing. (Doc. 13-6 at 3(10); doc. 13-3 at 5(17)).

8

Meyer testified at his deposition that "[n]o one in the facility including myself can manipulate that system." (Doc. 13-3 at 5(17)).

Deborah Jackson is involved in PPG's drug testing process. The following discussion took place during her deposition:

Q.     What is your role?

A.     I'm the occupational health nurse there. And my job is to secure [from First Advantage] the listing of the people to be tested each month and to test them.

. . .

Q.     Do you contact First Advantage to ask for a list, or does First Advantage contact you to give you a list?

A.     They contact me.

Q.     How are you contacted?

A.     They send me an E-mail that the list is ready.

Q.     And do you get one of those E-mails every day?

A.     No. Usually, once a month.

Q.     Do you ever contact First Advantage to recommend individuals to them for testing?

A.     No.

Q.     Would that be inappropriate?

A.     Oh, yes.

Q.    Do you have any knowledge as to how or what criteria First Advantage uses to select the employees for random drug testing?

A.    No.

Q.    When you get that list, is it E-mailed to you?

A.    Yes.

Q.    What if anything do you do with the list once you get it?

A.    Once I get the list, I set up appoint -- set up a time for employees to be tested.

Q.    And how many employees will you test on a given day?

A.    Depends on the work load. We have a whole month to get them tested. So, it depends on the work load of the clinic.

Q.    So, if you get a list on May 1st--

A.    Yes.

Q.     -- are all of those employees to be tested on May 1st?

A.    No.

Q.    Would it be your testimony that if you get a list of employees on May 1st that you have 30 days to test them?

A.    The whole month, whatever days are in a month.

Q.    And how do you go about selecting what employees are tested on the 1st versus what employees are tested on the 10th?

A.    Well, generally, I go by, me personally, I like to do all my day

10

shifters first. Because on second shift I may have to stay over, and third shift I have to come in.

Q.    Okay. How much notice do you give to these individuals before their test?

A.    Very little. It's a random drug screen.

Q.    Right. So, when you get this list on May 1st, if you're going to test somebody on May 10th, when will you notify them that they are going to be tested?

A.    On May 10th.

Q.    Will you call them on May 10th to set up the appointment?

A.    Generally, we contact the supervisor and have them to send the employee up.

Q.    Okay. Does the supervisor get any input on the day that the employee's going to be tested?

A.    Nope.

Q.    That's in your sole discretion, subject to the list that you're sent on May 1st?

A.    Right, I decide when to test those.

(Doc. 13-6 at 3(4)-4(14)).

Because the selection process is random, some employees are selected more often than others. Phillips is not the only employee who believes he was selected more frequently than others. Other employees have complained to Jackson they feel

11

like they are being selected more often than others.

Phillips admits he has no knowledge of any connection between First Advantage and PPG. Phillips admits he has no knowledge of any connection between First Advantage and Jamie Stephens. Phillips admits Stephens never told him she was making the decisions to have him drug tested. Stephens never recommended Phillips for drug testing, asked that he be drug tested, or had any role in the selection of employees for drug testing.

Jackson has a list of instructions to follow when administering a drug test. She usually follows the instructions on the front page. The back page is a chain of custody form. In order to insure accuracy and reliability, employees are required to sign the envelope containing the sample. If an employee fails to properly sign the envelope, the specimen will not be tested. (Doc. 13-6 at 6(21)).

It usually takes PPG 2 to 3 days to get results back from drug tests. The medical department keeps a list of everyone who has been tested, along with their test results, for five years.

**D.** **Stephens's Alleged Remark**

Phillips claims that, on one occasion, Stephens said to him, "the problem is you can't hear." Phillips stated in his deposition that this statement was made "a couple of years before [Phillips] got fired." (Doc. 13-2 at 5(5)). Stephens did not

12

communicate this to Phillips in writing, and neither did anyone else. Although Phillips admits he did not communicate with Stephens enough to be able to read her lips, he claims to have been able to read her lips on this occasion.

Stephens never told Phillips he should not be working at PPG. Stephens could not demote Phillips. Phillips has no evidence Stephens was involved in the decision to terminate his employment. Stephens was not involved in his termination appeal.

### E.   **Phillips's Job Transfer Requests**

#### 1.   *Pre-Finish Inspector Position*

It is undisputed that, in April 2013, a Pre-Finish Inspector position in the Inspection Department was available on the third shift. Phillips applied for this job. The position was a third shift position. PPG granted Phillips's request to transfer to the Pre-Finish Inspector position. Phillips, however, then declined the transfer.

Phillips was told he would have to train on third shift for about five weeks or three months and would be allowed to transfer to second shift when an opening became available. Phillips claims he turned down PPG's transfer offer because he believed he should have been allowed to bump the Pre-Finish Inspector on Second Shift based on his plant seniority, instead of waiting for a position on second shift to open up.

Employees have "plant seniority" and "department seniority." Each department

13

has its own seniority unit. The Finishing Department, where the plaintiff worked, is a separate department from the Inspection Department. Each has its own separate seniority unit. It is undisputed that Phillips would not have been able to replace or "bump" an employee on the second shift in the Inspection Department because he had no seniority in that unit.

### 2.    *Application to the Production Fixer Job*

In April of 2013, Phillips and other PPG employees applied for the "Production Fixer" job. A committee was convened to interview the qualified applicants for the job. On May 14, 2013, Phillips was selected for random drug testing, but the results of that testing were not immediately available. On May 15, 2013, Phillips was interviewed for the Production Fixer Position. The interview committee gave Phillips the interview questions in writing and Phillips admits the committee was fair. Phillips does not believe anyone during this interview process held his hearing impairment against him in anyway, and he is not making that claim now.

The selection decisions for the Production Fixer positions were not made until after Phillips's employment was terminated. Phillips was discharged for failing the May 14, 2014, drug test, his second failed drug test, before he found out who was selected for the position. It is undisputed that Phillips has no evidence he was denied the Production Fixer position because of his hearing loss.

### F. __Phillips's Communication Device__

When Jose Vega became Human Resources Manager in October 2012, he became aware that Phillips needed a communication device to create a better-suited work environment for Phillips at PPG. In his deposition, Vega agreed that it would it have been within his "realm of duties and responsibilities to make sure that if in fact a communication device had been requested by Mr. Phillips that it would have been obtained by PPG." (Doc. 13-3 at 4(16)). Vega testified that PPG never obtained a communication device for Phillips "because we were waiting on him to propose [it]. I never received that proposal or that request from Mr. Phillips in the type of device that was necessary for him." (Doc. 13-4 at 4(16)-5(17)).

### G. __Phillips's Failed Drug Tests__

According to Phillips, PPG did not drug screen prior to 2000. Phillips admits failing his first PPG drug screen in 2000 when he tested positive for marijuana. Phillips admits he smoked marijuana on numerous occasions during his PPG employment from 1997 to 2000. On July 21, 2000, after he failed the first drug screen, Phillips was required to enter into a Rehabilitation Agreement with PPG to remain employed. As noted previously, the Rehabilitation Agreement provided that Phillips would be subject to additional periodic testing after his return to duty, for a

15

period up to, and including sixty (60) months.[2] The Rehabilitation Agreement also provided that "any future positive screening result . . . may result in immediate termination." (Doc. 13-2 at 43). Phillips knew that any subsequent failed drug screen would result in immediate termination.

After the 60 month period expired, Phillips, like all PPG employees, continued to be selected, under the ADI policy, for random drug testing, throughout the remainder of his employment.[3]  On May 14, 2013, Phillips was selected for random drug testing and a hair sample was collected. Claudier Layne, the independent contractor who performed Phillips's test later told Jackson that "she had forgot to get him to sign the bag, and asked him to come back up." (Doc. 13-6 at 7(27)).[4] In her

---

[2]  Again, as noted previously, pursuant to the Rehabilitation Agreement, the employee

agrees to be placed in a FAA compliant follow-up testing regimen of at least six follow-up tests in the first twelve (12) calendar months following Employee's return to active work. Employee will be subject to additional periodic intoxicant follow-up testing after Employee's return to duty for up to and including sixty (60) months.  Any refusal to consent or cooperate fully with screening, or any positive screening result will result in immediate discharge.

(Doc. 13-2 at 43).

[3]  In his deposition, Meyer explained that company policy was "open-ended" drug screening for all employees.  (Doc. 13-3 at 6(23)).  When asked if the "60-month time limit is just a moot, meaningless reference," he stated, "I don't have information to give you an answer on that one, to be honest."  (Doc. 13-3 at 6(23)).

[4]  As noted previously, in order to insure accuracy and reliability, employees are required to sign the envelope containing the sample.  If an employee fails to properly sign the envelope, the specimen will not be tested.  (Doc. 13-6 at 6(21)).  As noted below, the "bag" to which Layne refers is the "shipping bag" into which  the sealed envelope containing the sample is placed.

deposition, Jackson identifies "a note that Claudier typed up regarding what happened with her and Eddie." (Doc. 13-6 at 7(27)). It reads:

> I performed a random hair drug screen on Eddie Phillips on May 14, 2013. After I completed the test I realized Eddie did not initial the sealed bag. The integrity seal which is used to seal the envelope was placed on the envelope and Eddie initialed the envelope. Everything was completed Eddie just forgot to initial the outside of the sealed shipping bag. I immediately called his supervisor[,] Jamie Stephens and asked that she send him back to medical to sign the sealed bag. Eddie came back up and signed the outside of the sealed bag. The bag was then shipped with 5 other samples to Psychemedics for testing. Psychemedics would have notified PPG if the drugs screens were not properly initialed or if the integrity seal had been tampered with and the hair samples would not have been tested.

(Doc. 13-6 at 17). This document was signed by Layne and Jackson.

Phillips tested positive for the narcotic pain medication, Hydrocodone. Phillips does not dispute the results of the drug test in May 2013, and admits he took Hydrocodone at the time of his May 2013 drug screen. He did not have a prescription for Hydrocodone on the day of his drug test on May 14, 2013.

Phillips has no basis to believe Stephens had any connection to his failed drug screen in May 2013.

Within about a week, Vega was informed that Phillips failed the May 14, 2013, drug test. On June 5, 2013, PPG informed Phillips he was being suspended for failing a drug test. Phillips was initially suspended by PPG from June 5, 2013, to June 11,

2013, for failing the drug test. At some point after being informed of the positive results, Vega, reviewed Phillips's personnel file for any prior positive drug screens, and discovered Phillips's Rehabilitation Agreement. Vega made the decision to terminate the plaintiff's employment as a result of the second failed drug test because it was a direct violation of his Rehabilitation Agreement. Phillips does not know of any employee who failed a second drug screen whose employment was not terminated.

### H.   Phillips's Termination Appeal

PPG provides employees an internal appeal process to allow them to request a review of a discharge decision. Meyer handles termination appeals. Meyer is not involved in the recommendation stage of a termination decision so he is able to maintain impartiality in case the employee appeals the decision.

Phillips appealed Vega's discharge decision, and met with Meyer for the appeal. Meyer communicated with Phillips in writing. During the termination appeal hearing, Meyer told Phillips that if he could get documentation from his doctor verifying either that he had a valid prescription for the Hydrocodone when his hair sample was taken or verifying that the doctor had advised Phillips to take his Mother's medication without a prescription, Meyer would consider it in the appeal. Phillips admits he was unable to get the requested documentation.

18

On July 17, 2013, the plaintiff's termination appeal was denied. Meyer upheld the termination based on the rehabilitation agreement Phillips signed after failing the first drug test. Phillips admits that Meyer was the final decision maker regarding his termination appeal.

## I.    <u>Vega and the Plaintiff</u>

Vega testified at his deposition that it was never reported <u>to him</u> (Vega) that the plaintiff had ever "appeared at work under the influence or intoxicated." (Doc. 13-4 at 6(24)). However, the following exchange also took place in his deposition:

> Q.    And, to your knowledge, were there any occasions which Mr. Phillips tested positive?
>
> A.    First time I knew about it was during the second positive. Part of the HR Manager, if there is a positive, they will notify myself, and I will check the personnel file of that employee to see if there's been any priors. So, that's when I found out.

(Doc. 13-4 at 7(25)).

Vega was only drug tested one time between October of 2012, and January of 2015. Drug testing records are not maintained in the Human Resources Department. Drug testing records are not part of the employee's personnel file. According to Vega, information concerning an employee's participation in the PPG rehabilitation program is maintained in the employee's personnel file. Phillips is the only PPG employee ever terminated <u>by Vega</u> for a failed drug screen.

19

### J.   **Meyer and the Plaintiff**

Meyer met Phillips within a few days of Meyer becoming the PPG plant manager in February 2013. Meyer was selected for drug testing by PPG one time between February 2013, and April 27, 2015.

### K.   **Stephens and the Plaintiff**

According to Jamie Stephens, Phillips's inability to hear presented a challenge for her and his coworkers. The following exchange took place in her deposition:

A.      It was a challenge with him not being able to – with his not being able to hear. But, you know, we wrote down whenever we needed to say anything, we wrote something down.

Q.      What kind?

A.      When we needed to communicate.

Q.      What kind of challenges did that present, Mr. Phillips'[s] inability to hear?

A.      Well, just, you just couldn't walk up to him and just start talking to him. You would have to either already have it written down what you wanted to say to him, or write it down as you were talking to him.

Q.      And did that ever pose any problems for you in supervising Mr. Phillips?

A.      I don't think so.

Q.      And what if anything other than writing things down did you and/or Mr. Phillips do to try to overcome those challenges?

A.     Nothing that I know of.

(Doc. 13-5 at 4(13-14)). Stephens has been drug tested by PPG three times in the last eight years.

Phillips states that he "knew" he was going to have problems with Jamie Stephens as soon as she came to his department. Stephens would ignore Phillips when he spoke to her and at times she would not even look at him when she came into his work cell. On one occasion, when Stephens was trying to resolve a problem with a casting machine, Phillips walked over to help and said he thought he knew what the problem was. Stephens responded by saying "I know what the problem is, the problem is you can't hear." (Doc. 13-2 at 5 (17)). Stephens claims she merely walked up to talk to Phillips once and said "Oh, shoot, he can't hear." (Doc. 13-5 at 4(16)).

Phillips worked on casting for ten years. One day Phillips commented that he hated working "Z-bars." The next day, Stephens took Phillips off of casting and put him on Z-bars, which was a more strenuous job.

## III.   ANALYSIS

### A.   <u>Counts One and Two</u>

Count One of the complaint alleges that PPG "discriminated against [the] [p]laintiff by denying him a transfer to a Pre-Finish Inspector position on the basis of his disability and/or perceived disability in violation of the ADA." (Doc. 1 at 4). In

21

Count Two, the plaintiff references the same denial as in Count One, and states that, although the defendant in fact offered him the Pre-Finish Inspector position for which he applied, a third-shift position, the defendant "[d]iscriminated against [the] [p]laintiff by denying him an assignment to the . . . position <u>on second shift</u> on the basis of his disability and/or perceived disability in violation of the ADA." (Doc. 1 at 5) (emphasis added).  Both counts reference a position which came open in "April 2013." (Doc. 1 at 4, ¶¶ 28, 34).[5]

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  The familiar *McDonnell Douglas* circumstantial evidence framework applies to ADA discrimination cases. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (*see also generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  The Eleventh Circuit has noted that

> [u]nder this burden-shifting analysis, [the plaintiff has] the initial burden of establishing a prima facie case of disability discrimination. *Wascura*

---

[5]  The parties also discuss a 2012 position in their briefs.  The plaintiff is clear that he "does not have a timely claim against PPG for denying him [that position].  (Doc. 21 at 19).

*v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir.2001).    To establish a prima facie case of ADA discrimination, [the plaintiff has] to show (1) a disability, (2) that [he] was otherwise qualified to perform the job, and (3) that [he] was discriminated against based upon the disability. *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir.2002); *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 910 (11th Cir.1996). Once [the plaintiff puts] forth a prima facie case, which establishes a presumption of discrimination, the burden then [shifts to the defendant] to articulate a legitimate, non-discriminatory reason for [his] termination. *Wascura*, 257 F.3d at 1242. [The defendant] simply [has] the burden of production, and [does not] need to persuade the court that it was motivated by the reason. *Id.* After the articulated reason [is] given, the inferential presumption of discrimination [is] eliminated, the *McDonnell Douglas* framework disappear[s], and [the plaintiff is] left with the ultimate burden of proving that [the defendant] intentionally discriminated against [him] because of [his] disability. [*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).] In order to prove this intentional discrimination, [the plaintiff is] allowed to show [the defendant's] reason was "unworthy of credence" and a pretext for discrimination. *Id.*

*Cleveland,* 369 F.3d at 1193; *see also*, *Ward v. United Parcel Serv.*, 580 F. App'x 735, 740 (11th Cir. 2014) ("To establish a prima facie case, a plaintiff may show that (1) he was disabled, (2) he was qualified to perform the job, and (3) he was subjected to an adverse employment action because of his disability.").[6]

---

[6] The Eleventh Circuit has also stated:

We have also cautioned that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir.2011). A plaintiff also may defeat a summary judgment motion by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quotation marks omitted).

The statute protects only "qualified individual[s]" with a disability. 42 U.S.C. § 12112(a). But "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C.A. § 12114(a).

Counts One and Two fail because there is no evidence of discrimination. It is undisputed that the position for which the plaintiff applied, the Pre-Finish Inspector position, was a third shift position. It is undisputed that, after he applied, the defendant offered the plaintiff the position. Finally, it is undisputed that the plaintiff declined the position because he only wanted the position if he could work in that position on second shift. Refusing to change the shift for this position, a position for which the plaintiff applied knowing that it was a third shift position, is not discrimination. The plaintiff offers no evidence that this refusal occurred because he is disabled.

In the statement of facts set out above, it is noted that, at the time the job was offered to him, the plaintiff felt that his seniority rights should have given him the right to "bump" someone off second shift in favor of himself. In his brief, the plaintiff makes no argument on this point (a point which the defendant disputes), and so the court treats it as abandoned. "'There is no burden upon the district court to distill

---

*Ward v. United Parcel Serv.*, 580 F. App'x 735, 740 (11th Cir. 2014)

every potential argument that could be made based upon the materials before it on

summary judgment. Rather, the onus is upon the parties to formulate arguments.'"

*McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007) (*quoting*

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995); *see also,*

*McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be

considered abandoned when district court is presented with no argument concerning

a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No.*

*669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding

that a district court "could properly treat as abandoned a claim alleged in the

complaint but not even raised as a ground for summary judgment"). Regardless, the

plaintiff now admits that he had no seniority rights to a second shift position. (*See*

doc. 14 at 10 (fact 51); doc. 21 (no dispute of fact 51)).

The plaintiff's only argument in support of his position is as follows:

> [T] here is no evidence in the record that the individual selected [for the position instead of the plaintiff] was actually assigned to third shift. Therefore, there is sufficient evidence to support a finding that PPG merely told Phillips he would have to work on third shift to discourage him from accepting the position, in effect, denying him the position sought.

(Doc. 21 at 19). This argument fails to acknowledge that, in order to make his prima

facie case, <u>the plaintiff</u> must first put forth evidence that he was discriminated against

because of his disability. Simply stating that "there is no evidence" that the person who was hired <u>for the third shift position,</u> was actually made to work third shift, is not evidence of anything. Counts One and Two will be dismissed.

## B.    <u>Count Three</u>

Count Three alleges that the defendant "discriminated against [the] [p]laintiff by denying him a promotion to the Production Fixer position on the basis of his disability and/or perceived disability in violation of the ADA." (Doc. 1 at 5-6). As to this claim, the plaintiff argues only:

> Phillips applied for a promotion to Production Fixer in April 2013. Phillips was interviewed for the position. However, Phillips was terminated as a result of PPG's discriminatory policies, practices, and procedures before the Production Fixer position was filled.

(Doc. 21 at 20). The plaintiff also vaguely cites to "Phillips Depo., p. 55." (Doc. 21 at 20). This conclusory and underdeveloped argument appears to be arguing that, had the plaintiff not been fired illegally, he would have been hired into the Production Fixer position. There is no evidence to support that the plaintiff would have received the position if he had not been fired.[7] Even if there were, because the court holds

---

[7] It is unclear at this time the exact state of the causation test to be applied here.  Judge Acker, in this district, has recently noted that the action taken against the plaintiff must be "solely because of" his disability, stating:  "Given the ADA's 'but-for' requirement . . . in order to state a claim of disability discrimination [the plaintiff] must specifically allege that her disability was the 'but-for' cause of her adverse treatment."  *Savage v. Secure First Credit Union*, No. 2:14-CV-2468-WMA, 2015 WL 2169135, at \*4 (N.D. Ala. May 8, 2015) (Acker, J.).  In that case he wrote:

below that the plaintiff's termination was not discriminatory, this count fails. Count

Three will be dismissed.

---

       Before the [*Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)] and [*Univ. of Texas Sw. Med. Ctr. v. Nassar*, ──── U.S. ────, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)] decisions, the Eleventh Circuit held that "the 'because of' component of the ADA liability standard imposes no more restrictive standard than the ordinary, everyday meaning of the words would be understood to imply ... convey[ing] the idea of a factor that made a difference in the outcome ... a 'but-for' liability standard." *McNely v. Ocala Star–Banner Corp*., 99 F.3d 1068, 1077 (11th Cir.1996). While recognizing that the ADA's statutory text requires "but-for" causation, the Court in *McNely* found that "but-for" causation was "not to mean 'solely because of' ... [but rather] liability whenever the prohibited motivation makes the difference in the employer's decision." *Id.* at 1076. However, in light of the Supreme Court's *Gross, Nassar*, and [*Burrage v. United States*, ──── U.S. ────, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014)] decisions rejecting the mixed-motive possibilities, under statutes that employ virtually the same language, "reliance on *McNely* for this point is of dubious merit." *July v. Bd. of Water & Sewer Comm'rs of City of Mobile*[,] 2012 WL 5966637, at \*12 (S.D.Ala. Nov. 29, 2012) (Steele, J.); *Parsons v. First Quality Retail Servs.*, LLC, 2012 WL 174829, at \*8 (M.D.Ga. Jan. 20, 2012) (Royal, J.) ("whether a mixed motive theory is cognizable under the ADA is still an open question in this circuit ... [and] [w]hile the Eleventh Circuit has not addressed the issue, several circuits have expanded the reasoning of Gross to the ADA because it contains very similar language"). When in 2012 Judge Royal of the Middle District of Georgia said that the question is open in the Eleventh Circuit, he did not have available to him what the Supreme Court said 2 years later in *Burrage*, which eliminated any lingering doubt about whether the reasoning in *Gross* and *Nassar* applies to the ADA. The props under *McNely* have been removed, so that the Eleventh Circuit cannot rely on *McNely*. The governing jurisprudential principle is expressed as recently as April 30, 2015 by Chief Judge Carnes in *Santiago–Lugo v. Warden*, 785 F.3d 467, 471–72 (11th Cir.2015), in which the Eleventh Circuit recognizes that a prior precedent is only binding "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court ..." (*quoting United States v. Lopez*, 562 F.3d 1309, 1312 (11th Cir.2009)). Like the ADEA in *Gross*, "the ADA renders employers liable for employment decisions made 'because of' a person's disability, and *Gross* construes 'because of' to require a showing of but-for causation ... [therefore] a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir.2010) (emphasis added); *see also Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir.2010).

*Savage*, 2015 WL 2169135, at \*4.  Judge Acker's decision is currently under appeal to the Eleventh Circuit.

### C.    <u>Counts Four and Five</u>

Count Four alleges that the defendant "discriminated against [the] [p]laintiff by subjecting him to disparate treatment on the basis of his disability and/or perceived disability in violation of the ADA by: (1) subjecting him to drug tests more frequently than employees outside the protected class, and (2) terminating [the] [p]laintiff for failing a drug test when similarly situated employees outside [the] [p]laintiff's protected class have not been terminated for engaging in substantially similar[] conduct under similar conditions." (Doc. 1 at 6-7). Count Five alleges that the defendant "discriminated against [the] [p]laintiff by terminating him on the basis of his disability and/or perceived disability in violation of the ADA." (Doc. 1 at 7).

As to the frequency of drug testing, even assuming that the plaintiff was drug tested more frequently than non-disabled employees, <u>PPG</u> is not responsible for determining who is tested. It is undisputed that employees are randomly selected for drug screens by a third party vendor, a company called "First Advantage." (Doc. 13-6 at 3(10); doc. 13-3 at 5(17)). Meyer testified at his deposition that "[n]o one in the facility including myself can manipulate that system." (Doc. 13-3 at 5(17)). The plaintiff has offered no evidence that PPG, in any way, controlled how often he was selected for testing. Accordingly, the plaintiff cannot make out a prima facie case

because he cannot show that <u>PPG</u> discriminated against him.[8]

As to his termination, the plaintiff cannot make out a prima facie case under either Count Four or Five because he is not a qualified individual with a disability. As noted above, "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C.A. § 12114(a). Phillips tested positive for the narcotic pain medication, Hydrocodone. Phillips does not dispute the results of the drug test in May 2013, and admits he took Hydrocodone at the time of his May 2013 drug screen. It is undisputed that he did not have a prescription for

---

[8] The best the plaintiff can do is argue that he was discriminated against because, on May 1, 2013, Jackson was provided a list of names for drug testing, which included the plaintiff, and she did not test the plaintiff until May 14, 2013–one day before he was to be interviewed for the Production Fixer position. First, <u>when</u> Jackson chose to administer the test has nothing to do with how frequently the plaintiff was chosen for testing–which is his claim. Second, there is no evidence that testing him the day before he interviewed for the position affected him in any way. On May 15, 2013, Phillips was interviewed for the Production Fixer Position. There is no evidence that the results of that test were available at that time. Phillips admits the committee which interviewed him was fair. Phillips does not believe anyone during this interview process held his hearing impairment against him in anyway. It is undisputed that Phillips has no evidence he was denied the Production Fixer position because of his hearing loss.

PPG also proffers the "third party vender" reason as its legitimate non-discriminatory reason for the frequency of testing. (Doc. 14 at 20). Count Four also fails because the plaintiff has failed to rebut this reason.

Also, to the extent that the plaintiff bases any part of this action on the fact that he was tested after the 60 month period of the Rehabilitation Agreement expired (see doc. 21 at 21), he has failed to show discrimination. The Rehabilitation Agreement provided for 60 months during which the plaintiff was subject to "<u>additional periodic testing.</u>" After that period, under the ADI, the plaintiff was still subject to regular random drug testing, just like every other employee of PPG.

Hydrocodone on the day of his drug test on May 14, 2013.[9]

Even if the plaintiff was a qualified individual, he still has the ultimate burden of proving that the defendant intentionally discriminated against him because of his disability. *Reeves*, 530 U.S. at 142-43. In this case, Vega made the decision to terminate the plaintiff's employment, and that decision was upheld by Meyer. Phillips admits that Meyer was the final decision maker regarding his termination appeal. Phillips does not allege in this case that Vega took any action against Phillips because of Phillips's hearing loss. Phillips also does not accuse Meyer of taking any action against him because of Phillips's hearing loss.

Further the plaintiff could cite no other employee of PPG who had ever failed a second drug screen and <u>was not</u> terminated.[10] Indeed, in her affidavit, Smith stated

---

[9]  The plaintiff argues that the proper procedures for testing his sample were not followed.  (Doc. 21 at 22-23).  If an employee fails to properly sign the  envelope containing the specimen, the specimen will not be tested.  (Doc. 13-6 at 6(21)). The evidence clearly established that the envelope into which the plaintiff's specimen was placed was signed by him.  The plaintiff argues, incorrectly, that <u>both</u> the bag and the envelope must be signed or the specimen will not be tested, and that the plaintiff did not sign the bag at the time he gave the specimen.  Even if the plaintiff was correct, he does not explain what difference such a mistake should make in this case, especially when he admits that the test results are correct.

[10]  The plaintiff argues that "Phillips is the only PPG employee ever terminated <u>by Vega</u> for a failed drug screen.  (Doc. 21 at 23) (emphasis added).  He writes:

>  Vega claims he checked Phillips'[s] personnel file prior to terminating Phillips to see if Phillips had previously failed a drug test even though, according to Vega, drug testing records are not maintained in the Human Resources Department and are not part of the employee's personnel files. [Vega Dep., p. 25, 30, 31-32.] According to Vega, information concerning an employee's participation in the PPG rehabilitation program is maintained in the employee's personnel file.

>  It is interesting to note, the PPG Medical Department only keeps a list of everyone

that "[s]ince [she] has worked in Human Resources for PPG . . . every employee who has failed a second . . . drug screen has been discharged." (Doc. 13-1 at 5).[11]

Finally, the entirety of the plaintiff's argument regarding PPG's alleged failure to provide the plaintiff reasonable accommodations (doc. 21 at 15-17) is irrelevant to any issue in this case. As the plaintiff notes, he "has not filed an enumerated claim against PPG for failure to accommodate his disability." (Doc. 21 at 17).[12]

## IV.   CONCLUSION

Based on the foregoing, the defendant's motion for summary judgment will be **GRANTED**, and this case will be **DISMISSED**. A final order will be entered.

**DONE** this the 24th day of November, 2015.

_VEHopkins_

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

who has been tested, along with their test results, for five years. [Jackson dep., p. 44.] This is, consequently, the same length of time provided for periodic testing under the Rehabilitation Agreement utilized by PPG.

(Doc. 21 at 23-24). Exactly what any of this discussion adds to the plaintiff's claim is unclear. Similarly, there is no relevance to the plaintiff's argument that there is no evidence that the plaintiff ever came to work under the influence of any drugs. (Doc. 21 at 24).

[11] The court has read, and considered, the plaintiff's attempt at establishing pretext. (Doc. 21 at 24-25). Even if the plaintiff had established a prima facie case of discrimination, nothing the plaintiff states in that short section rebuts the defendant's legitimate non-discriminatory reasons for terminating him–*i.e.* that he failed his second drug test.

[12] Phillips claims that this alleged conduct "is indicative of PPG's attitude, animus, intent, and disregard for Phillips and his impairment." (Doc. 21 at 17). Phillips does not explain how these "indications" make a difference to his case.